Filed 7/28/22  In re A.M. CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>L.M. et al.,<br><br>    Defendants and Respondents, | D079797<br><br>(Super. Ct. No. EJ04137B) |

APPEALS from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Office of County Counsel, Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Appellant.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Respondent L.M.

Emily Uhre, under appointment by the Court of Appeal, for Minor A.M.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Respondent W.H.

INTRODUCTION

At the permanency planning hearing, the juvenile court found A.M. was likely to be adopted but L.M. (Mother) had established the parental-benefit exception and declined to terminate her parental rights. The San Diego County Health and Human Services Agency (the Agency) appeals. The Agency concedes Mother met the first two elements of the parental-benefit exception; that is, Mother regularly and consistently visited A.M. and A.M. had a significant, emotional, and positive relationship with Mother. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] The Agency, however, contends the court abused its discretion in performing the weighing analysis on the third element when it concluded that it would be harmful to the child to sever her relationship with Mother and choose adoption. Finding no abuse, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Proceedings Before Section 366.26 Hearing*[2]

Mother gave birth to her first child, An.M., when she was 19 years old. In March 2017, the juvenile court took jurisdiction over An.M. and removed him at birth due to Mother's substance abuse and mental health issues.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] We derive the facts, in part, from our prior opinion affirming the juvenile court's order denying A.M.'s section 388 petition seeking to return A.M. to Mother's care under family maintenance services, in *In re A.M.* (Jan. 26, 2022, D079250) 2022 Cal.App.Unpub. LEXIS 474 (*In re A.M. I*).

Mother, who had been exposed to domestic violence as a child, had begun abusing methamphetamine and alcohol as a teenager. After making progress with her case plan, An.M. was returned to her for a 60-day trial period in June 2018. But in August 2018, Mother was arrested for being under the influence of a controlled substance, willful child cruelty, and resisting a peace officer. At the time of her arrest, Mother was 33 weeks pregnant with A.M. and officers determined she could not care for herself or 17-month-old An.M. About two months later, at age 21, Mother gave birth to A.M. while incarcerated.

The Agency removed A.M. from Mother three days after her birth and filed a petition on behalf of A.M. in November 2018, alleging that Mother used methamphetamine while pregnant and had a history of mental illness. The Agency temporarily placed A.M. with caregivers who also cared for her half-sibling, An.M. As a result of the dependency petition filed on behalf of A.M., the Agency had again removed An.M. from Mother and returned him to the care of his former foster parents. Upon her release from custody in December 2018, Mother entered a residential treatment program. She had weekly supervised visits with both children.

In January 2019, the juvenile court sustained the petition, declared A.M. a dependent, ordered reunification services for Mother and placed A.M. in the foster home with An.M. In March, the juvenile court denied reunification services to A.M.'s presumed father, W.H. (Father), due to his incarceration.[3] (§ 361.5, subd. (e)(1).)

---

[3] Father was serving a 16-month prison sentence following his arrest in December 2018 for being a felon in possession of a concealed and loaded firearm.

In April 2019, Mother completed her residential recovery program and transitioned into another program where she did well. Her case manager reported that Mother always tested negative for drugs. Although Mother claimed she was no longer in a relationship with Father, the social worker found Mother and Father together in July, two days after he was released from prison. Mother and Father admitted to multiple incidents of domestic violence that occurred during An.M.'s reunification case. At the six month-review hearing in October, the court ordered services for Father and daytime unsupervised visits for Mother. At the 12-month review hearing in February 2020, the court anticipated returning A.M. to Mother's care by the next hearing date.

A.M. had been returned to Mother's care June 4, 2020, where she remained until September 29. At the 18-month review hearing in August, the court ordered A.M. placed with Mother. But the next month, the Agency filed a section 387 petition to remove A.M. from Mother's care based on the child's exposure to the parents' domestic violence. Mother obtained a restraining order to protect herself and A.M. from Father. The Agency returned A.M. to her former foster parents, who had already adopted An.M. and wanted to adopt A.M. In December, the foster parents obtained de facto parent status. In January 2021, the court sustained the section 387 petition, terminated the parents' reunification services, and scheduled the matter for a permanency planning hearing pursuant to section 366.26.

In June 2021, A.M.'s counsel filed a section 388 petition asking the court to return A.M. to Mother's care with family maintenance services. After an evidentiary hearing, the court found changed circumstances but denied the petition, finding the requested change would not be in A.M.'s best interests. Mother and A.M. appealed. This court acknowledged it was "a

4

close case" but concluded the juvenile court did not abuse its discretion in denying A.M.'s section 388 petition. (*In re A.M. I, supra*, 2022 Cal.App.Unpub. LEXIS 474 at p. *20.)

B.     *Section 366.26 Hearing*

The juvenile court held the permanency planning hearing in October 2021. Over three days the court heard testimony from Agency social worker Leah Nelson, Mother, the maternal grandfather, Dr. Elizabeth Stanton (a psychologist who performed a bonding study), R.B. (De Facto Father), and an Agency supervisor. It also received reports from the Agency, Dr. Stanton's bonding study, and a visit observation performed by an investigator for A.M.'s counsel.

1.     *Agency's Reports and Social Worker's Testimony*

In her section 366.26 report, Nelson reported that Mother continued to test negative for drugs and was attending NA/AA and codependency meetings. Mother told Nelson she was no longer in contact with Father and "t[ook] responsibility for what she did in the past." She visited A.M. weekly and "all observers report[ed] that she has a great relationship with [A.M.] and does well on the visits." Nelson had observed three visits and noted that Mother came prepared with items for A.M. and was "attentive" to A.M., who appeared happy throughout the visits. In April 2021, the Agency approved Mother for expanded unsupervised time and overnight visits with A.M. "The [c]ourt indicated [M]other ha[d] displayed a change in circumstance that would warrant this additional time," and Mother "maintain[ed] that she does not have contact with the father and has remained substance free including alcohol since September 2020."

Except the four months she was in Mother's care from June 4 to September 29, 2020, A.M. had lived with her de facto parents since her birth.

5

At the time of the section 366.26 hearing, A.M. was three years old. She lived with her older half-sibling An.M., who had been adopted by the de facto parents, who wanted to also adopt her. A.M. had a positive relationship with all the children in the home, including the de facto parent's biological and two other adopted children. Nelson reported that A.M. transitioned "well and without issue" from her foster home to visits with Mother.

The Agency recommended the court terminate Mother's parental rights to free A.M. for adoption. Nelson acknowledged in her section 366.26 report: "[T]his is not a typical case when it comes to permanency planning. The mother is doing well, has recently been ordered expanded visitation, and has a strong relationship with the child. The Agency has weighed all of this against the overall benefits of permanency for the child and has determined that the best plan for [A.M.] would be adoption. The Agency is of the opinion that birth family contact remains in the best interest for all children who are adopted as long as the contact is not detrimental or unsafe to the child. The Agency recognize[d] the relationship between the mother and [A.M.] and would recommend that this remain in place even after a permanent plan is selected."

At the hearing, Nelson testified she believed A.M. would benefit from continuing a relationship with Mother, stating "it would be really hard" on A.M. if her relationship with Mother was terminated but "it would [not] be detrimental." Nelson testified A.M. would benefit by continuing a relationship with both the de facto parents and Mother. She believed A.M. would benefit from being able to maintain relationships with her grandparents and great grandparents because this contact connected her to family history and "access to that information is always important for children in [the] long term and just in permanency in general." Still, Nelson

6

believed it would be in A.M.'s best interest to terminate Mother's parental rights to free her for adoption.

2. *Dr. Stanton's Bonding Study Report and Testimony*

Dr. Stanton observed about five and a half hours of visitation between Mother and A.M. in May and June 2021. At the time, A.M. was about two and a half years old. In her report, Dr. Stanton concluded "Mother and [A.M.] have a healthy (secure) attachment pattern." She observed Mother initiated affection and responded to A.M.'s needs, used disciplinary measures appropriate to the child's developmental age, and responded supportively when the child showed fear or needed direction. A.M. was comfortable with her surroundings, was relaxed and curious, and responded positively to Mother setting limits. When it was time to depart, separation from Mother did not cause A.M. to become overly emotional, which Dr. Stanton saw as a sign that A.M. felt "assur[ed]" Mother will return. "Overall, Mother and [A.M.'s] interactions were positive, playful, reciprocal, and appropriate. Other than Mother becoming agitated by her father, no concerns presented."

Dr. Stanton testified A.M. transitioned easily between de facto parents and Mother because A.M. knew both parents would be there for her. Like Nelson, Dr. Stanton believed A.M.'s relationship with Mother benefited A.M. because it gave her "a point of reference and connection in terms of her identity." She explained "those things are more significant later in life than they may be now" and "definitely provide some benefits to [A.M.] later in life." Dr. Stanton opined it would be detrimental to A.M. if contact with Mother were to abruptly stop. She explained "cognitively [A.M.] may not experience any immediate trauma" but that "[t]here are long-term effects that are at risk for occurring or that [A.M.] may experience when it comes to being separated from a biological parent." In Dr. Stanton's opinion, "in a perfect world" the

7

"best case for" A.M. would be "for her to be adopted by [her] foster parents and then have the benefit of her biological mother in her life."

### 3. *De Facto Father's Testimony*

De Facto Father considered A.M. to be part of his family and wanted to adopt her. The de facto family had made a strong connection to A.M. and A.M. to them, including "all of her siblings." But if the juvenile court decided to not terminate parental rights and ordered a lesser permanent plan of legal guardianship, he testified he was not willing to take legal guardianship of A.M. He explained, "I don't think that's in the emotional benefit for the kids."

### 4. *Juvenile Court's Ruling*

The juvenile court found by clear and convincing evidence that A.M. was adoptable, noting among other things that A.M. has been in her current placement for a substantial period, the de facto parents wanted to adopt her, and there appeared to be no legal impediment to adoption. It then turned to the parental-benefit exception. The court first concluded the exception did not apply to Father, finding "it would not be detrimental to [A.M.] to terminate his parental rights." Father had not maintained a relationship with A.M. and "it would not be in [A.M.'s] best interest to promote or facilitate a father/child relationship."[4]

Next, the juvenile court concluded the exception did apply to Mother, finding Mother had regular visitation and contact with A.M., A.M. had a "substantial, positive, emotional attachment" to Mother, and that "terminating the attachment would be detrimental to [A.M.], even when balanced against the [countervailing] factors and benefits of adoption." The

---

[4]    Father did not appeal the order terminating his parental rights.

8

court set a hearing 30 days out to give everyone time to process the court's decision and for the Agency to advise the court on other appropriate permanent plan options.

The Agency timely appealed the juvenile court's section 366.26 order applying the parental-benefit exception to not terminate Mother's parental rights.

DISCUSSION

I.

*The Parental-Benefit Exception to Adoption*

During a section 366.26 hearing, the juvenile court must choose one of three permanent plans: adoption, guardianship or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) When the court finds by clear and convincing evidence the child is adoptable, "the court shall terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) The parent has the burden of showing the termination of parental rights would be detrimental to the child under one of the exceptions to adoption. (See *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the statutory exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subds. (c)(1) & (c)(1)(B)(i).) As the California Supreme Court has said, this exception

9

"preserves [a] child's right to [a] relationship [with his or her parent] even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent. (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).)

There are three elements a parent must prove, by a preponderance of the evidence, "to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) A "crucial aspect of the [juvenile] court's responsibility" at the section 366.26 hearing is deciding "whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the [juvenile] court determines whether terminating parental rights serves the child's best interests." (*Id.* at pp. 631–632.)

Here, the Agency contends the court erred in finding the parental-benefit exception applied to preclude termination of Mother's parental rights. It concedes Mother met the first two elements required to establish the exception: Mother regularly and consistently visited A.M., and A.M. had a significant, emotional, and positive relationship with Mother. However, it contends the court abused its discretion in performing the weighing analysis on the third element when it concluded it would be harmful to the child to sever her relationship with Mother and choose adoption. Specifically, the Agency asserts: (1) the court erroneously shifted the burden of establishing a basis to terminate parental rights to the Agency; (2) the court incorrectly ruled *Caden C.* precluded consideration of evidence regarding the benefits A.M. would derive by remaining in the de facto parents' home as an adoptive

10

placement and the harm A.M. would suffer if she were removed from their care; and (3) the court relied on "amorphous speculation" that at some point in the future A.M. could suffer detriment due to losing access to Mother and maternal relatives if parental rights were terminated. The Agency asserts these legal errors require us to reverse and remand the matter for the juvenile court to properly conduct the weighing analysis under *Caden C.*

We disagree and reject the Agency's contentions.

## II.

### *The Juvenile Court Did Not Erroneously Shift the Burden to the Agency*

Regarding the first claim of error, we conclude the record does not support the Agency's contention that the juvenile court erroneously shifted the burden of establishing a basis to terminate parental rights to the Agency. As the Agency concedes, "[t]he juvenile court applied the correct legal standard" in concluding Father had failed to demonstrate it would be detrimental to A.M. to terminate his parental rights. The court then turned to whether the exception applied to Mother, and said: *"The parent has the burden* by preponderance of the evidence to establish [the] three separate criteria" under *Caden C.* (Italics added.) The court then analyzed each of the three elements under *Caden C.* As to the first, the court found Mother had regular visitation and contact with A.M. Because the Agency did not dispute this fact, the court found it was "definitely established" and *"[M]other has carried her burden* by a preponderance of the evidence on that particular prong." (Italics added.)

Looking at the second element, the juvenile court again said, *"the parent must show* that the child has a substantial, positive, emotional attachment to the parent" and that it must be "[t]he kind of attachment implying the child would benefit from continuing the relationship." (Italics

11

added.)  The court found A.M. saw Mother as her mother.  The court noted that during the reunification process it had restored custody to Mother, which "does not happen" unless there has been a specific finding of "a healthy attachment of child/parent," and Mother had progressed to overnight visits, which also "does not occur unless there is a substantial benefit to the child." For those reasons, the court found "*the mother has carried her burden* by [a] preponderance of the evidence as to the second prong."  (Italics added.)  The court commended the de facto parents for their support and lack of interference in Mother's relationship with A.M., and then said, "I do believe, again, *the mother has carried her burden* by the preponderance of the evidence" as to the second element.  (Italics added.)

The juvenile court turned to the third element, which it noted was "the ultimate and most difficult decision under *Caden C.*"  (Italics added.)  But before making its findings, the court told counsel it was going to "pause" to "offer the following observations":

> "*Caden C[.]* I believe is a shot across the bow[ ] of this system that we do have to reorganize and retool.  That in the past while there has been good faith efforts to struggle with these issues, assess these issues, and make decisions, it is a far more intricate and complex process that truly does deserve a real complex and full assessment.

> "Now I say that because in my position right now having to make this decision, it is clear to me that there needs to be a safety valve in place.  It is absolutely painful to see the emotional upheaval that the foster family and the mother are going through because of this particular point in the case.

> "Now I want to make three things clear before I go further.  First, the Agency has done everything appropriate in this case. . . . [¶]  Second, the de facto parents are placed in a position that I believe is completely unfortunate.  They were asked to provide an environment for this child that would help her reach her potential.  And they have done that.  Because there is a sibling in that household and because the child has been with

12

them for such a long period of time it would be naive not to recognize the developing expectations of this family as a family unit. [¶] Conversely, we have provided the mother with opportunity that she has taken advantage of to be with her child and to maintain and nurture a relationship. What is at play here, in my view, is the uncertainty that we are infusing this process with at this time." (Italics added.)

The court acknowledged the de facto parents might be "somewhat fearful of what the uncertain future would be if adoption is not finalized" and Mother "is understandably upset and disquieted at the prospect of losing her parental rights." It then noted that such fear and uncertainty, through no one's fault, "forces everyone into their own particular corner, . . . where compromise cannot be reached." In that context, the court referenced a kinship adoption and stated "[t]hat is not available to us. That type of safety valve, if it's an option, would give the parties an opportunity on a much more comfortable level [to] probe a compromise. And also reenforce their own particular prospective of what they feel would be necessary to give them confidence that they can guide this child into the future."[5]

---

[5] The Agency suggests the juvenile court's "observations" here constituted part of the court's analysis of the parental-benefit exception. Not so. We agree with Mother that "[r]ead in context, there can be no question that the court's ruminations were made during a pause of its analysis of the exception." The Agency also claims the court's comment that *Caden C.* was " 'a shot across the bow[ ]' " shows the court "misunderstood *Caden C.* as changing the legal standard to make it easier for parents to establish the beneficial parent-child relationship exception." We cannot agree with the Agency's view of the record. The court's comment acknowledged that in *Caden C.*, the Supreme Court disapproved numerous appellate court decisions that were mistaken in how the parental-benefit exception applied and what evidence should be considered. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 636, fn. 5, 637, fn. 6, 638, fn. 7.)

Returning to the third element under *Caden C.*, the juvenile court again stated "*[t]he parent must show* by preponderance of the evidence that terminating the attachment would be detrimental to the child, even when balanced against the [countervailing] factors and benefits of adoption."[6] (Italics added.) The court found the benefits of adoption were "obvious." It then noted the benefit to A.M. by maintaining her relationship with Mother, including providing "a bridge to the extended family." The court stated: "[A]t this stage the [c]ourt has to find whether terminating attachment would be detrimental to the child. . . . And here I do find that the *mother has carried her burden* by a preponderance of the evidence that it would be detrimental." (Italics added.) It observed the dependency system has been "an architect in teaching this child that [Mother] is her mother," and that by restoring custody and placing A.M. with Mother during reunification services, "we did teach the child this is her mother. . . . It may be briefer than others and may be somewhat different th[a]n others, but it does not detract from the situation that at a particular time [Mother] is with her child, she is interacting in a parental fashion." After those final observations, the court again said: "So I do find, again, that the *mother has carried her burden* by a preponderance of the evidence. And the [c]ourt will therefore find that there is not a compelling reason to terminate the mother's parental right[s] at this time." (Italics added.)

On this record—where the juvenile court expressly stated seven times that Mother had the burden of proving all three elements of the parental-

---

6    The reporter's transcript in this case has some obvious typographical errors. Instead of "countervailing" factors, for example, it states "counter veiling factors." As another example, Dr. Stanton referred to "detriment" numerous times during her testimony, but the reporter's transcript spells the word "determent." We infer the true meaning from context.

benefit exception—the Agency's assertion that the court erroneously shifted the burden is unfounded. The Agency selects the court's final comment, that "there is *not* a compelling reason to terminate the mother's parental right[s]" (italics added), and argues that single statement is proof the court shifted the burden of establishing a basis to terminate parental rights to the Agency, and that it failed to understand it was Mother's burden to show "a compelling reason for determining that termination would be detrimental to the child" under section 366.26, subdivision (c)(1)(B)(i). We disagree.

Not only did the juvenile court say seven times that Mother had the burden of establishing the parental-benefit exception to adoption, but it also explicitly stated Mother's burden on the third element was to "show by preponderance of the evidence that terminating the attachment would be *detrimental to the child, even when balanced against the [countervailing] factors and benefits of adoption.*" (Italics added.) And in finding Mother had met her burden, the court stated it was finding "*it would be detrimental*" to sever A.M.'s relationship with Mother. (Italics added.) It is not reasonable to interpret the Agency's selected quotation as suddenly shifting the burden to the Agency to show a compelling reason why Mother's parental rights should not be terminated. It is evident the court misspoke by placing the word "not" before the words "compelling reason," and that it meant to say that Mother's establishment of the parental-benefit exception constituted a "compelling reason *not* to terminate [her] parental rights." (*Caden C., supra,* 11 Cal.5th at p. 636, italics added.) All together, the court's statements make clear it found Mother had met her burden to show "a compelling reason for determining that termination would be detrimental to the child" due to the parental-benefit exception, as required under the statute. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.,* at pp. 631–632.)

15

## II.

### *The Juvenile Court Did Not Erroneously Exclude Evidence Relevant to the Parental-Benefit Exception*

The Agency contends the juvenile court erred in three evidentiary rulings sustaining Mother's objections to testimony elicited by the Agency on relevancy grounds. First, the court sustained Mother's relevancy objection when the Agency's counsel asked De Facto Father if, and when, he and his wife adopted An.M. The court sustained Mother's second objection on relevancy when the Agency asked De Facto Father: "Is your relationship with [Mother] part of the reason why you don't want to take legal guardianship of [A.M.]?" The court rejected the Agency's argument that the elicited testimony was relevant to the court's weighing of the benefits of adoption, and how A.M.'s life would be if the court terminated Mother's parental rights and the de facto parents adopted A.M. The court explained that, irrespective of its ruling, the section 366.26 hearing did not entail removing A.M. from the de facto parents and, consequently, information about the sibling relationship between An.M. and A.M. would not be useful.

The juvenile court sustained a third relevancy objection when the Agency's counsel asked a social worker supervisor, "In your opinion, what emotional effect would it have on [A.M.] if she were removed from the de facto[ ] [parents'] home?" The Agency's counsel argued "although it's not a factor to determine [whether] the exception applies," it was relevant to "the big picture of what could happen to this child." In sustaining the objection, the court explained, "As it stands now with *Caden C*[.] [and] its progeny, the [c]ourt is instructed to concentrate solely on the relationship with the child to the mother with regard to the first criteria. And then solely as to the strength of the relationship with the child to the mother on the second

16

criteria. Which funnels us down to the third criteria where the [c]ourt has to determine if the [detriment] to terminate parental rights is or is not outweighed by the benefit of adoption." (Italics added.) And if the court finds the exception applies, it "would go to other proceedings."

In its closing argument, the Agency emphasized that Dr. Stanton did not assess the bond A.M. had with her de facto parents and was not able to testify "how much it would benefit" A.M. "to continue a life in their home." The Agency argued Dr. Stanton's testimony "shed no light on whether the benefits of adoption outweigh maintaining [Mother's] parental relationship." On that crucial point, the Agency argued the de facto parents' home was "the only home" A.M. has ever known, and reminded the court that De Facto Father testified he was not willing to take legal guardianship. The Agency urged the court to not ignore this factor in determining whether the benefits of adoption outweighed the benefits of maintaining Mother's relationship with A.M. It argued the benefits that A.M. derived from her weekly visits with Mother were "not worth potentially losing" A.M.'s placement with her de facto family, that the court cannot "ignore what will happen to this little girl if parental rights are not terminated," and if the court declined to terminate parental rights it "could possibly jeopardize" A.M.'s relationship with An.M. "and deprive [A.M.] of growing up in [the] same home as her biological brother."

Mother's counsel argued the only expert to testify opined that the benefit of A.M.'s relationship with Mother does outweigh adoption, and it is best for A.M. if she is in a "stable situation" and visited by Mother. Mother's counsel then asserted:

> "[I]t is unfortunate that the foster parents are indicating they are not willing to be a stable situation if they don't win in trial today. But that is not a factor under *Caden C.* And I would

argue that if they are not willing to provide this child with stability unless everything goes their way, they may not be a stable placement in any regard, even if they adopt. This child could reach out to her mother in a couple years from now, in the future, and how will they react to that? Will they decide that they need to end the relationship[?] We have far too many adoptive homes that wind up coming back before [the] juvenile court, unwilling to parent through the adolescent and teenage years. And the fact that they are saying that now, really leads to a concern as to whether or not we should value that stable situation only if they adopt versus getting guardianship. [¶] Again, under *Caden C*[.] what we are supposed to look at is the value of the parents' relationship, which in this case is a significant bond and a secure attachment that the child will suffer harm if it's ended versus the permanency and stability of adoption. Not necessarily the permanency and stability of adoption of this home. We're not to compare the two homes." (Italics added.)

A.M.'s counsel started her argument noting how difficult this case has been for her, and as A.M.'s guardian ad litem, her assessment focused on A.M.'s best interest. A.M.'s counsel argued Mother met her burden on all three elements of the parental-benefit exception. Counsel also commented on De Facto Father's unwillingness to consider legal guardianship:

"So they want the child in their home as long as it's on their conditions. And it's always been my belief we love our children without condition regardless of what life imposes. So I wonder really how stable is this home? Is [A.M.] going to lose her mom and the caretakers too? There is a lot that is very speculative here. Very speculative whether or not she is going to suffer harm. How great that harm is going to be. What is going to look like for her. It's very hard. We know something is going to happen. We know she is a well-adjusted child. She is very well adjusted. The [domestic violence] incident that led . . . to being removed from mom's care after four months of being with her mom does not seem to have [a]ffected her or the relationship between her and her mother. We know that something is going to happen. None of us has a crystal ball and we just don't know what that something is going to be. She is going to experience

18

loss. And she is going to experience, . . . a loss of a parent. So even though she may have the de facto parents, who she does also see as parents, she is going to have a loss. And it's my argument that this adoptive home that she is in, is not going to mitigate that loss because she has two separate sets of parents. One that she goes home to and one that she goes and visits. And that's how it's been from the beginning of her life."

In rebuttal argument, the Agency's counsel conceded it "is very possible" that A.M. "may experience this loss or ambiguous loss," as Dr. Stanton had testified. But she argued "[i]t is very possible that [A.M.] will not experience this," and they should not "assume and speculate" that A.M. will "have all this loss. It is very likely she will not."

As to the third element of the parental-benefit exception, the juvenile court found that Mother "carried her burden by a preponderance of the evidence that [terminating parental rights] would be detrimental" to A.M., explaining:

"We can speculate considerably as to whether the issue of ambiguous loss will effect this child. But I think the more important inquiry is, is it detrimental to expose her to the potential of ambiguous loss? And I will have adopted Dr. Stanton's view of that. I think it is the [view that is] more supported by the record and is more in line with the [c]ourt's own interpretation of the record."

The Agency asserts the juvenile court erroneously sustained Mother's relevancy objections. It argues that evidence of A.M.'s relationship with her prospective adoptive family, and the harm she would suffer if removed from their care, is relevant to the specific benefits of adoption by the de facto parents if the court terminated Mother's parental rights. It claims it was an abuse of discretion for the court to "assume" A.M. will remain in her de facto family's home if it selects a lesser permanent plan than adoption and her de facto parents are unwilling to agree to that lesser plan, "[j]ust as a [juvenile] court cannot assume a child will have ongoing contact with a parent if it

19

terminates parental rights." In making that assumption, the Agency argues, the court "essentially placed a greater burden on the Agency to show a basis for terminating parental rights than on the proponents of the exception." We have already rejected any contention the court misapplied the relevant burden of proof in determining application of the parental-benefit exception. We further disagree there was any abuse of discretion in the court's evidentiary rulings.

Generally, "all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) A trial court has broad discretion in determining the relevance of evidence but lacks discretion to admit irrelevant evidence. (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 197.) " 'It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. [Citation.] "A 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1018.)

The focus of the third element is on the harm to a child in severing his or her relationship *with a parent* and choosing adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The juvenile court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life"

(*ibid.*) and thus must examine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent]' " (*ibid.*).  Juvenile courts are required to "determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance" the harm in terminating parental rights.  (*Id.* at p. 640.)  For example, in *In re A.L.* (2022) 73 Cal.App.5th 1131, the appellate court did not compare the attributes of the prospective adoptive family with those of the father but discussed facts related to the child's relationship with the prospective adoptive family.  It did so because this evidence was relevant to weighing the potential benefit of the child's placement in the adoptive home without the relationship with his or her biological parent.  (*Id.* at p. 1157; see also *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342 [juvenile court properly considered bond between father and child and child's bond with the proposed adoptive parent].)

Thus, we agree with the Agency's argument that evidence of A.M.'s relationship with her prospective adoptive family is relevant to the specific benefits of adoption by the de facto parents if the juvenile court terminated Mother's parental rights.  We reject, however, the Agency's broad conclusion that in sustaining the three evidentiary objections the court erroneously declined to consider the specific benefits of adoption by the de facto parents.

The juvenile court here *overruled* Mother's relevancy objection to a question asking De Facto Father whether he wanted to adopt A.M.  Doing so, the court observed that "the third [element is] described by the Supreme Court as a daunting task of balancing.  While the [c]ourt is not to compare the two households, circumstantial evidence of the strength of each or the other household I think is relevant in the balancing."  Contrary to the

Agency's argument, the court acknowledged the relationship A.M. had with her prospective adoptive family in addressing the third element, stating: "Here the benefits of adoption are obvious. The child continues in an environment that is familiar. That has been supportive. That gives guidance to the child. The foster parents have adopted the sibling. The sibling has thrived in their care, which is very strong evidence that this child would enjoy and benefit from the same environment."

The juvenile court here properly recognized the need to examine the relationship A.M. had with her prospective adoptive family as part of the weighing process. (*Caden C., supra*, 11 Cal.5th at p. 633 [noting that "a new stable home" "could make the loss of a parent not, at least on balance, detrimental"].) On this point, the court read and considered the Agency's reports and acknowledged the de facto parents had adopted An.M. These reports detailed A.M.'s close relationship with the prospective adoptive family, including An.M. Thus, the court had before it ample evidence on A.M.'s relationship with the de facto parents and A.M.'s prospective adoptive home. Even assuming the court erred in sustaining the three relevancy objections, the Agency fails to show how the exclusion of the challenged evidence prejudiced it.

The harm a dependent child may suffer *if removed from his or her prospective adoptive family*, however, is not relevant to the third element of the parental-benefit exception.[7] The Agency admitted this point in its response to Mother's relevancy objection when the Agency's counsel asked a

---

[7] The *Caden C.* court had no occasion to address this point because apparently no evidence was presented regarding the child's relationship with the foster mother, a nonrelative extended family member, or whether the foster mother had expressed an interest in adoption. (*Caden C., supra*, 11 Cal.5th at pp. 626, 627–628.)

social worker supervisor for her opinion on the emotional effect to A.M. if removed from the de facto home. The Agency's counsel conceded the elicited opinion was "not a factor to determine the exception applies," but that the court should hear the evidence anyway, because it would give the court the "big picture of what could happen" to A.M. In sustaining the objection, the court noted that removing A.M. from her current placement was not at issue at the section 366.26 hearing and, if it found the parental-benefit exception applied, other proceedings would be held regarding placement.

The purpose of the permanency planning hearing is to select and implement a permanent plan for a dependent child. (§ 366.26; *Caden C., supra*, 11 Cal.5th at p. 630.) Adoption is the preferred permanent plan, *unless* the parent establishes the parental-benefit exception, and the very purpose of that exception is to *preserve a child's right to a relationship with her parent,* even when the child cannot safely live with that parent. (*Caden C.*, at p. 643.) The focus is on the harm in severing the child's relationship with the parent, and whether that harm outweighs the benefit to the child of placement in a new adoptive home. (*Id.* at pp. 631–632.) So as the juvenile court correctly noted, removing a dependent child from *his or her prospective adoptive family* is not the question before the court at the section 366.26 hearing.

Moreover, it is one thing for prospective adoptive parents to express at the section 366.26 hearing the unwillingness to consider legal guardianship, but it is a wholly different thing at the post-permanency planning review hearing for prospective adoptive parents to ask the Agency to remove the child they wanted to adopt because the juvenile court declined to terminate parental rights. The Agency's argument that, potential harm to a child if removed from prospective adoptive parents must be weighed in examining

the third element of the parental-benefit exception, improperly injects an element of coercion into the process. If such evidence is considered during the weighing process, a parent is placed in a no-win situation because prospective adoptive parents would essentially have the power to defeat the parental-benefit exception.[8] Counsel for Mother and A.M. touched on this point in their closing arguments, questioning the stability of the prospective adoptive home and arguing the de facto parents only wanted A.M. on their terms.

To the extent the challenged testimony related to the harm A.M. might suffer if removed from the de facto parents, it was not relevant to application of the parental-benefit exception and the Agency was not prejudiced by its exclusion.

III.

*The Juvenile Court Did Not Abuse Its Discretion in Finding Mother Had*
*Established the Third Element of the Parental-Benefit Exception*

The Agency asserts the juvenile court relied on "amorphous speculation" that at some point in the future A.M. could suffer detriment due to losing access to Mother and her maternal relatives if parental rights were terminated. It argues this is exactly the type of speculative or incidental

---

[8] We do not fault De Facto Father for expressing his feelings should parental rights not be terminated. As the juvenile court's thoughtful comments acknowledged, the section 366.26 hearing is an emotionally charged stage of the proceeding for all parties and the de facto parents were understandably afraid of what might happen if Mother's parental rights were not terminated.

harm that is insufficient to establish applicability of the parental-benefit exception.

"[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.) This highly deferential standard prevents us, as a reviewing court, from substituting our own judgment about what is in the child's best interests for the juvenile court's determination. (*Ibid.*) We reverse only if the evidence, viewed most favorably in support of the juvenile court's action, shows that no judge could reasonably have made the order that he or she did. (*Id.* at p. 641.) Here, we conclude the juvenile court's decision was well within the bounds of its discretion.

"[U]nderstanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "[W]here terminating a child's substantial, positive attachment to the parent would, on balance, be detrimental to the child, that simply is a compelling reason not to terminate parental rights." (*Id.* at p. 636.) In determining whether severing the parental bond would harm the child, the juvenile court "must delicately balance factual determinations to assess an uncertain future situation." (*Id.* at p. 641.) The court must determine whether "the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would

experience from the loss of [a] significant, positive, emotional relationship with [the parent.]' " (*Id.* at p. 633.) This evaluation necessarily involves a degree of uncertainty. (*Id.* at p. 640.)

The Agency's concessions (at the section 366.26 hearing and on appeal) that Mother regularly and consistently visited A.M. and A.M. had a significant, emotional and positive relationship with Mother made it unnecessary for us to examine the first two elements of the parental-benefit exception. We do so now because the evidence supporting these elements are relevant to the third element of the analysis. The " 'strength and quality' " of the relationship between A.M. and Mother developed during visitation "substantially determine[s] how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

Mother initially had weekly supervised visits with A.M., which then progressed to twice weekly supervised visits. In June 2019, approximately six months after A.M. was detained, the same amount of visitation had progressed to unsupervised. A.M. also saw the maternal grandparents once a week. The Agency reported that A.M. appeared "happy and well adjusted in both her foster home and during her visits with the mother." Significantly, at the 12-month review hearing in February 2020, the juvenile court found that, based on the parents' progress in complying with the case plan, it appeared that A.M. would be "returned home by the next review hearing, and one of the permanent plans listed in . . . § 366.26(b) will not need to be selected at that hearing." In March 2020, Mother started overnight visits with A.M. but

the COVID-19 pandemic temporarily stopped in-person visits, which resumed in May 2020.

In early June 2020, the juvenile court placed A.M. with Mother where she remained for approximately four months until the Agency again detained her due to domestic violence concerns between the parents. Mother then had supervised visitation until December 2020, when she resumed unsupervised visitation. In April 2021, the Agency expanded Mother's unsupervised time and, in June 2021, Mother started weekly overnight visits which continued through the section 366.26 hearing in October 2021.

When A.M. was approximately 26 months old, a Children's Legal Services Investigator heard A.M. calling Mother " 'mama.' " As Mother pushed A.M. on a swing, A.M. told her " 'I love you.' " During this same timeframe, an investigator from the office of Mother's counsel observed six visits between A.M. and Mother. The investigator consistently observed A.M. become excited to see Mother, smiling, opening her arms, and not becoming fussy when leaving the caretaker. Mother was "well prepared" for each visit and 100 percent "engaged with [A.M.], aware of safety and [paid] attention to the child's nonverbal cues." The investigator described Mother's parenting style as "structur[ed], protect[ive], and nurturing." Mother also demonstrated "appropriate parental behavior[ ]," "was good about anticipating potential problems as they arose while in play," and "always maintained safety."

The Agency acknowledged "that this is not a typical case when it comes to permanency planning." Mother was "doing well," "ha[d] recently been ordered expanded visitation," and had "a strong relationship with [A.M.]" At the section 366.26 hearing, Mother testified A.M. called her "mommy" or "[m]ama" and A.M. called the maternal grandfather "papa." Nelson, the

27

social worker, testified she consistently observed A.M. smile and put her arms up to be held when walking toward Mother. Mother appropriately parented A.M. and Nelson had no concerns with Mother's parenting skills. At two unannounced visits when Mother had A.M. overnight, Nelson had no concerns. Nelson believed that A.M. would benefit from continuing a relationship with Mother and testified "it would be really hard" on A.M. if her relationship with Mother was terminated, although she believed it would not be detrimental. She also testified A.M. would benefit from being able to maintain relationships with her grandparents and great grandparents because this contact connected her to family history, which is "always important for children in [the] long term and just in permanency in general."

Dr. Stanton concluded A.M. had a secure and healthy attachment with Mother. A.M. comfortably transitioned between the de facto parents and Mother, because she knew both parents would be there for her. Like Nelson, Dr. Stanton believed A.M.'s relationship with Mother benefited A.M. because it gave her "a point of reference and connection in terms of her identity." She explained "those things are more significant later in life than they may be now" and she opined it would be detrimental to A.M. if contact with Mother were to abruptly stop. She explained "cognitively [A.M.] may not experience any immediate trauma" but that "[t]here are long-term effects that are at risk for occurring or that [A.M.] may experience when it comes to being separated from a biological parent."

The evidence shows that despite Mother's problems, she has been a constant presence for the *entirety* of A.M.'s young life. Nelson also testified that A.M.'s exposure to domestic violence and substance abuse has *not* impacted her relationship with Mother. Although Mother was not able to completely resolve the problems that led to the juvenile court taking

28

jurisdiction over A.M., these problems have not negatively impacted A.M.'s relationship with Mother.  Rather, the evidence amply shows that A.M. and Mother share a significant, emotional, and positive relationship and Mother's problems have not impacted the quality of this relationship.

We now turn to whether the juvenile court abused its discretion by ultimately concluding that termination of Mother's parental rights would be detrimental to A.M. due to her relationship with Mother.  On this issue, the court stated that it adopted Dr. Stanton's professional opinion that it would be detrimental to expose A.M. to the potential of experiencing ambiguous loss.  The evidence supports the juvenile court's conclusion.

Dr. Stanton opined it would be detrimental to A.M. if her visits with Mother were abruptly ended.  Given A.M.'s young age, Dr. Stanton could not predict whether A.M. would suffer any immediate consequences if her visitation with Mother ended.  She noted A.M. had the ability to adapt given her young age but stated that A.M.'s behavior could shift because of the change in her schedule.  Based on the number of factors involved, Dr. Stanton testified it was hard to know what negative consequences A.M. might suffer "[b]ut there is data that supports the idea that there are great benefits that come from being connected with biological family members."

She believed ending A.M.'s visits with Mother placed A.M. at risk for long-term effects.  She spoke of a study that involved adult adoptees who had been separated from a biological parent.  These individuals suffered a "grief experience" that was not negated by being raised in a "great, loving home" and "a great likelihood" existed that these individuals "will want to know about their birth parent."  Seventy percent of the individuals experienced "some significant degree [of] uncertainty or ambiguous loss."  When asked if individuals adopted as infants were less likely to suffer these risks,

29

Dr. Stanton testified these risks existed regardless of the individual's age when adopted. Dr. Stanton explained these individuals would try "to close th[is] information gap" and the inability to do so "can be a risk for [detriment] later in life" and that some individuals can even suffer "significant challenges when it comes to their mental health."

In response to the court's questions, Dr. Stanton testified that A.M.'s loss of Mother could manifest itself in A.M.'s late childhood and early teenage years when she begins to understand the meaning of adoption, despite having a "stellar" home environment. She testified adult adoptees are "overrepresented when it comes to . . . clinical settings" with issues including anxiety, forming healthy interpersonal relationships, and interfamilial relationship problems.

Dr. Stanton stated that if Mother's parental rights were not terminated, A.M. would benefit from having the support of two families as she develops and grows into an adult. If this occurred, Dr. Stanton believed the issue of "competitive parenting" would need to be looked at and that "both parties [need to be] supportive of the involvement and influence of each family" so that A.M. is not placed in the middle of a conflict. When asked about A.M. either keeping her relationship with Mother, or being adopted into a forever home, Dr. Stanton believed it was more important to find a solution that kept A.M. in contact with her biological parent. She opined the benefits of having a connection with a biological parent "are tremendous" and the benefits of continuing the "relationship between [A.M.] and [Mother] outweigh[ed] the speculative nature of what could happen."

The juvenile court could reasonably conclude from Dr. Stanton's expert testimony that terminating Mother's parental rights would be detrimental to A.M. and that adoption by the de facto parents did not outweigh this harm.

To the extent the record supported a contrary inference, we are not authorized to substitute our own judgment as to what is in A.M.'s best interests for the juvenile court's determination. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The Agency's attempt to discount Dr. Stanton's opinion of potential detriment as "amorphous" and "speculative" is contrary to *Caden C.*, *supra*, 11 Cal.5th 614, which recognized that the weighing required for the third element requires the trial court to "engage in a delicate balancing of [factual] determinations as part of assessing the likely course of a future situation that's *inherently* uncertain." (*Id.* at p. 640, italics added.) Moreover, the Agency's own analysis relied on speculation regarding what A.M.'s de facto parents may decide at a future hearing.

The Agency argues the testimony of Nelson and De Facto Father that A.M. did not spontaneously ask about Mother between visits, or state that she missed Mother, shows A.M. would not be harmed if Mother's parental rights were terminated. Section 366.26, subdivision (h)(1), provides: "At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child." A.M., however, was not quite three years old at the time of the section 366.26 hearing. Dr. Stanton testified that while A.M. was "verbal" she was also "pretty noncommunicative." Nelson's and De Facto Father's testimony on this point had little meaning in this case given A.M.'s tender age.

Moreover, the juvenile court could reasonably draw inferences from other evidence to fulfill its responsibility to consider A.M.'s wishes to the extent ascertainable. A.M., who is too young to understand the concept of a biological parent, has had three parents throughout her life—the de facto parents and Mother. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 459, 467 [two-year old child was "very young, too young to understand the concept of a

31

biological parent"].) She recognized her de facto parents as " 'mommy' " and " 'daddy' " and Mother as " 'mama.' " She easily transitioned between the de facto parents and Mother which suggested to Dr. Stanton that A.M. knew that both parties would be there for her. Significantly, the Agency acknowledged "this is not a typical case when it [came] to permanency planning" and recommended that the relationship between Mother and A.M. remain in place even after a permanent plan is selected. However, terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, and the juvenile court is required to assume termination of parental rights severs that relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The Agency acknowledged Mother's importance to A.M. when, despite the fact Mother's reunification services had been terminated in January 2021, it changed Mother's visits from supervised to overnight in June 2021 and continued these overnight visits through the section 366.26 hearing in October 2021.

Finally, we reject the Agency's argument that the juvenile court relied on "mere incidental, amorphous benefit" which it claims appellate courts have repeatedly explained "is not sufficient for the parent-child relationship exception to apply." The cases on which the Agency relies in support of this proposition, *Autumn H.*, *supra*, 27 Cal.App.4th 567, *In re Brittany C.* (1999) 76 Cal.App.4th 847, and *In re Katherine J.* (2022) 75 Cal.App.5th 303, are inapposite. The portions of each of those cases cited by the Agency concern the evidence necessary to establish the second element—whether there is a positive, emotional attachment between parent and child—concluding that a parent needs to demonstrate more than an "incidental benefit" to the child to establish the beneficial relationship exception. (*Autumn H.*, at p. 575 ["[i]nteraction between natural parent and child will always confer some

incidental benefit to the child"]; *Brittany C.*, at p. 854 [" '[i]nteraction between [a] natural parent and child will always confer some incidental benefit to the child' "]; *Katherine J.*, at p. 318 ["beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].) These cases do not assess the concept of ambiguous or speculative benefit in the weighing process for the third element of the parental-benefit exception.

We have no difficulty concluding the juvenile court's decision was not arbitrary, capricious, or absurd. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) Rather, after considering the Agency's reports, carefully listening to the testimony and reviewing the evidence, and considering counsels' arguments, the juvenile court acted well within its discretion in finding the benefits of adoption did not outweigh the detriment in terminating Mother's parental rights. Consequently, the court did not abuse its discretion by concluding that Mother satisfied the third element of the *Caden C.* test. Accordingly, we affirm the court's application of the parental-benefit exception in this case.

## DISPOSITION

The order declining to terminate Mother's parental rights based on application of the parental-benefit exception is affirmed.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.